Agricultural .Bank *v.* Burr.

THE AGRICULTURAL BANK *versus* CALEB H. H. BURR. & *al.*

A person becomes legally entitled to shares in a bank by having them transferred to him on the books of the bank. The certificate of ownership is but additional evidence of title.

The legal title to shares in a bank, evidenced by the records of the corporation, will not be affected by the owner's permitting the bank to treat them as its own property.

Whether a bank has paid in fifty per cent. of its capital stock in gold or silver within six months after receiving its charter, is to be ascertained and proved in the manner prescribed in the statute, by the certificate of the commissioners appointed for that purpose.

When a bank has been in operation for several years, it is to be presumed that the remaining fifty per cent. of its capital stock has been paid within twelve months after the reception of its charter.

Where a bank charter is received and takes effect on the first day of a certain month, the corporation may legally act under the charter on that day; and a legal transfer of shares in the bank may be made on the first day of the same month of the next year.

In no proper sense can individuals be considered as agents of a bank in making their own note payable to the same bank.

When an agreement has been reduced to writing, purporting to be between certain individuals in relation to the transfer of shares in a bank, but not signed by all the parties, their rights must depend, not upon what they considered them to be, nor upon the fact, that the parties considered the agreement to be closed, and one party claimed the benefit thereof; but upon the application of the principles of law to the facts proved.

THIS action was submitted for the decision of the Court upon the facts stated in the deposition of Cornelius Bedlow, jr. formerly cashier of the bank, with the paper annexed thereto; and the Court was authorized to order a nonsuit or default to carry the decision into effect. The substance of the contents of the deposition appear in the opinion of the Court.

*Hobbs,* for the defendants.

1. The note declared on is void, it being made in substitution for one given in violation of the statute regulating banks and banking. Stat. 1831, c. 519, § 3.

It was substituted for the note of Holbrook and Joel Wilson of Oct. 12, 1836, which note was received in payment for the capital stock to enable the bank to go into operation. The capital stock should have been paid in, in gold or silver.

Taking the notes was a fraud and a violation of the statute. The substituted note is tainted with the fraud.

2. If it is said that the note was given in consideration of a transfer of the stock, the answer is, that that too is a violation of the statute, because no transfer thereof could be made " except by execution or distress, or by administrators or executors," until the whole amount of the capital stock had been paid in ; no part of these 68 shares was ever paid in.

3. But there was no transfer of the stock to the defendants, and so no consideration for the note. The facts agreed, or testimony of Bedlow, put this beyond doubt.

The defendants *appeared* on the books of the bank to be stockholders, but no certificates of stock were ever delivered to them. Besides, the bank ·treated this stock as its own ; received the dividends and paid the taxes, and what is more, sold two shares to French, without the intervention of the defendants, and took the proceeds to their own use.

4. But if the note is valid then the defendants contend, that they were the mere agents of the bank ; and that the directors' bond of indemnity, and the action of the bank in regard to this stock, are evidence to prove, and does in fact establish such agency.

The commencement of the present suit is in violation of the agreement of the parties ; and although said agreement, or bond of indemnity cannot, perhaps, be pleaded in bar of 'the action, yet to avoid circuity of action, the Court will treat it as matter of recital and admission, to operate as an estoppel. The authorities to this point are collected in Saunders' Pl. and Ev. vol. 1, title, admission ; 1 Greenleaf on Ev. § 22, 23, 24.

The defendants were induced to sign the notes upon the representations and covenants of the plaintiffs. They cannot acquire an advantage to themselves by violating their covenants or agreements, which, for the purposes of the present defence, may well be treated as admissions. Stark. Ev. part 4, title, admissions. Jan'y 4, 1845.

*E. Kent* and *S. W. Robinson,* for the plaintiffs.

This action is prosecuted by the receivers of the bank, for

the benefit of its creditors, and also of the other stockholders. It appears, from the deposition of Bedlow, that when the bank was about to go into operation, it was found that the 68 shares now represented by the defendants, had not been taken up. It was supposed to be necessary that they should be, in order to put the concern into operation. Accordingly, an agreement was made between the then directors or managers of the concern on one side, and the defendant, Burr, and one Wilson, on the other, by which the latter agreed to take these shares till some other arrangement should be made, giving their note therefor at the par value. This was 12th October, 1836. In this agreement, it was stipulated that Burr and Wilson should not be considered liable on their note, but should be indemnified therefor by the other party. Subsequently, for reasons stated in the deposition of Bedlow, a new arrangement was made, 1st April, 1837, by which Holbrook was substituted for Wilson, as a stockholder, and Burr and Holbrook, the present defendants, gave their note for the amount, which is the note in suit.

How far the private agreement in favor of Burr and Wilson above mentioned, was renewed in the new arrangement with Burr and Holbrook, and when, if at all, will be considered presently. It is sufficient here, to observe that the agreement was throughout, from its nature, a secret one. Its very purpose and object required that it should be concealed from the public, and the case furnishes no grounds for supposing that it was known to the other stockholders, who undoubtedly paid in their money in the full reliance, that the defendants were *bona fide* subscribers to these 68 shares.

To the maintenance of this action, several objections are raised by the defendants' counsel.

1. That the note is void, as being in violation of the statute of 1831, c. 519, § 3.

That section requires that, before a bank goes into operation, 50 per cent. of its capital stock shall have been actually paid in, &c. Not that each individual stockholder shall have paid in 50 per centum on the amount of his stock, but merely that

that proportion of the whole capital shall have been paid in. It is to be presumed that this provision had been duly complied with by the other stockholders, else the bank could not have gone into operation. The contrary supposition would make the commissioners guilty of fraud and perjury, in certifying what was not true.

2. The clause in the same section of the act of 1831, restricting transfers of stock, is also relied on by the defendants. That clause does not apply to a case like the present. It intends, obviously, a transfer of shares from one already a stockholder to some other person, in the ordinary way of bargain and sale, as merchandize. Here was no such transfer. The original subscription was rescinded, with the consent of certain officers of the bank, so far as Wilson was concerned, and Holbrook was substituted in his place, and occupied his position, just as if he had been an original subscriber.

Whether such an arrangement was authorized by the law or not, it is not competent for the defendants to avail themselves of the objection, as we shall attempt to show in conclusion of the argument.

3. It is insisted that here was no consideration for the note, because the stock was not actually conveyed to the defendants.

It is a sufficient answer to say that they consented to be held out to the public as stockholders, by being entered on the bank books as such, and gave their note for the amount. This made them stockholders. No delivery of certificates was necessary for that purpose. They were legally entitled to such certificates, and might have had them if they had desired it.

The circumstances testified to by Bedlow, of the control exercised by the directors over these 68 shares, after they were taken by the defendants, and the sale of two of them to French, show only that the defendants were not expected to be permanent stockholders. They consented to take the stock for the time being, with the understanding that as fast as the directors should find persons willing to take shares and pay for them, they would relinquish the required proportion of stock

and have an indorsement made on their note *pro tanto.* If the business of the bank had been prosperous, we should never have heard of this defence. It has turned out otherwise, but they must abide by the liabilities they have assumed. They consented to take their chance in the adventure. "As they have sown, so must they reap."

4. As to the effect of the supposed contract between the directors and the defendants.

Bedlow testifies under the impression that the written contract, made Oct. 12, 1836, with Burr and Wilson, was renewed April 1, 1837, in favor of Burr and Holbrook ; and that the contract of Dec. 1, 1841, a copy of which is annexed to his deposition, was a renewal of this second contract. In this he is certainly mistaken, as is demonstrated by subsequent parts of his own testimony. He refers to the memorandum in brackets, at the end of the last contract ; and this shows it to have been a renewal, not of the supposed contract of April 1, 1837, but of the original one of Oct. 12, 1836. It is manifest that there never were but these two contracts reduced to writing ; though the other may have been *talked of,* and hence the confusion in the witness' mind.

But if the facts had been as he supposes, they would still amount to nothing, as neither of the contracts was ever executed to the defendants, or delivered to them ; hence they are to be regarded as mere nullities. It cannot be pretended that Bedlow was the agent of the defendants so far as to make a delivery to him of the papers, equivalent to a delivery to them ; for he expressly says they were placed in his hands for the purpose of being delivered to the parties when they should have been signed by the defendants, which was never done. Bedlow seems to think he was in some sort an agent or trustee of the defendants, but no fact is disclosed showing him to have been invested with any such character. All that appears is, that on one occassion he advised Burr to have the contract signed, &c. But the latter did not comply with the advice, and his reply to Bedlow, translated into plain English, amounts to this, " I prefer to let the matter stand. Perhaps the con-

cern may prove a good speculation, but if it is likely to turn out otherwise, if you see any danger, let me know in season that I may claim the benefit of the contract." Matters remained thus till a few days before the bank failed, when it seems there was an "apprehension" of something, and the old dead contract was resuscitated in a new draft; but even this was never signed by the defendants, nor delivered to them, but remains in Bedlow's hands to this day.

Again, if the supposed contract had been duly executed, so as to bind all the parties to it, still it cannot avail the defendants to defeat the action. It is not a contract with the plaintiffs, but one between them and certain individuals who do not even assume to contract for or bind the plaintiffs. It does not appear that these were directors, and the contract at most amounts only to an agreement by a third party to indemnify the defendants for signing the note; and to that party they must look for redress.

But, placing this matter on the ground the most favorable for the defendants which can possibly be claimed, the defence is still unavailing. Supposing those who contracted with them to have been the actual board of directors (which does not appear) and that they had contracted in that capacity (which they did not,) still, their contract cannot bind the plaintiffs for the following reasons: —

1st. They had no authority to bind the plaintiffs by any such arrangement.

2d. It was a fraud upon the creditors and *bona fide* stockholders of the bank, who have a right to rely upon this note as a portion of the common assets. They are interested to have this note collected and brought into the common fund, that equal justice may be meted out to all. They have parted with their own money or given their securities in good faith, and now it is sought to add to their already severe losses by releasing these defendants from the payment of their note. The creditors and the *bona fide* stockholders are represented by the receivers, who have brought this suit for their benefit. The arrangement relied upon in the defence, was a deliberate

scheme of fraud and deception, to which the defendants voluntarily lent themselves. They cannot be relieved from the consequences of their imprudent act, without gross injustice and wrong to innocent parties, and therefore the defence must fail. March 5, 1845.

*Hobbs* in reply : —

The arrangements made between the defendants and the individuals named in the agreement, whatever they were, were adopted by the plaintiffs, and acted upon by them, as binding upon the bank, from the time it went into operation, in Oct. 1836, till its affairs were placed in the hands of the receivers. That agreement was signed by said individuals as directors. Such is the testimony of Bedlow ; or a fair inference from what he testified. But whether the directors had authority to make such an agreement, or not, it is enough for the defendants, that the bank approved it and treated the stock as its own. The fact that the receivers have charge of the bank's concerns, cannot change the nature of things, or its relations to others.

It is competent for the debtors of the bank to show fraud, usury or any other matters in defence of claims existing against them on the books, or in the papers, of the bank.

The real stockholders have no cause of complaint. These 68 shares are their property and have been managed as such. They have had the dividends on them. They have paid the tax. The creditors of the bank have ample security against the *bona fide* holders of stock.

The receivers have nothing to do with the relative rights of stockholders. Their commission ends with the payment of the debts due to bill holders and other creditors of the bank. Rev. St. c. 77, § 75.

The case finds, that the defendants were not subscribers to the 68 shares, before or at the time the bank went into operation, but that said shares had been subscribed for or agreed for "by certain persons in Bangor, who afterwards failed to pay for them," so that when the bank went into operation these shares were the property of the bank, and on which the bank

must have advanced the half required by law. There is no pretence that the defendants, Burr and Wilson, ever paid anything to put the bank in operation.

If the arrangement of Oct. 12, 1836, was a fraud, the plaintiffs were parties to it and cannot take advantage of it.

The bank being thus a stockholder could not sell or transfer its shares until the whole capital had been paid in, in gold or silver. The sale to the defendants, if it be such, was in violation of Stat. 1831, c. 519, § 3. The distinction between a sale by the bank, and by a stockholder, " as merchandize," attempted to be raised by plaintiffs' counsel, does not exist. The language of the statute is general, " no shares, &c."

But there was no consideration for the notes; no certificates of stock were delivered; none were recorded; no evidence of any transfer of stock to the defendants. Every fact tending to show a transfer is negatived by the conduct of the bank in relation to these shares, treating them always and uniformly as their own; and by that of the defendants in not claiming dividends thereon. March 11, 1845.

The opinion of a majority of the Court, WHITMAN C. J. concurring with the other Judges in the result, but giving his reasons in a separate opinion, was drawn up by

SHEPLEY J. — This suit is upon a negotiable promissory note for the sum of seven thousand and three dollars, made by the defendants on April 1, 1837, and payable to the bank on the first day of October following. The case is submitted, as an agreed statement, upon the deposition of Cornelius Bedlow, jr. who was formerly the cashier of the bank.

Several grounds of defence are presented in a written argument for the defendants. The burden of proof is upon them. One is, that the promise was made without consideration. Bedlow states, that " the amount of stock taken by them, for which said note was given, was sixty-eight shares;" and that they became stockholders on the books of the bank for those shares on that day; but no certificates of stock were ever delivered to them. A person becomes legally entitled to shares

by having them transferred to him upon the books of the bank. The certificate is but additional evidence of his title. That the title was conveyed by a transfer upon the bank books is shown by several provisions of the statutes then in force. That was the evidence of title, upon which they might be attached on a writ, or seized and sold upon an execution ; and upon which the cashier was to rely, when he gave to an officer a certificate to enable him to attach and sell them. The sale by an officer would transfer the title without regard to any certificate, which the owner might hold. Ch. 60, § 6, 7, 8, and Ch. 519, § 18. The cashier might be required by the twenty-second section of the last named chapter to make a return under oath of the names of the stockholders and of the amount of stock owned by each. This he could only do by an inspection of the bank books. The twenty-eighth section provided, that the liability of a stockholder should not continue beyond the term of one year after he should have duly trans- ferred his stock, showing that the title passed by the transfer. Indeed, it was then the only mode of conveying the title; for this transfer was made before the passage of the act of 1838, c. 325, which authorized a transfer by an indorsement and delivery of the certificates and an entry of that transfer upon the records of the corporation. The fact, therefore, that no certificates were delivered, did not prevent the defendants from becoming the legal owners of the shares. Nor did the other facts stated by the cashier, that the directors exercised the entire control of the stock, and managed it as the property of the bank, received the dividends, and paid the taxes upon it, change or destroy their legal title. The sale of the two shares could have been effectual, by the directors, only by a transfer on the books made by the defendants, or by their con- sent. They might at any time have transferred the other shares, and the bank could not have resisted their right to do so. Those shares might have been seized and sold on an ex- ecution against them, and conveyed as their property. The legal title would not be affected by their permitting the bank to treat them as its own property.

It is further contended, that they did not become the owners of those shares, because they were illegally transferred before the capital had been wholly paid into the bank. The statute, c. 519, § 3, provided, that the capital should be paid "in gold and silver money in manner following, to wit: one half within six months and the other half within twelve months after receiving said charter." And that no bank should go into operation until fifty per cent. of its capital had been thus paid. This fact was to be ascertained and proved in the manner prescribed by the statute; by the appointment of commissioners to examine and count the money actually in its vaults; and to ascertain by the oaths of a majority of its directors, that so much of its capital had been paid towards payment of their respective shares; and to return a certificate of the facts to the office of the secretary of state. As the bank continued in operation for several years, this must be presumed to have been done. No mode of proof was prescribed by the statute, that the last half of the capital had been paid within the time allowed. These enactments were probably designed to insure a solid capital, and to prevent irresponsible persons from taking the stock, that they might speculate upon it by a transfer without being obliged to pay for it. The intention was to prohibit a transfer until after the whole capital was required to be paid in. The intention could not have been to prohibit and render illegal, transfers made many years after that time, upon proof, that the whole capital of the bank had never, in fact, been wholly paid in. The effect of such a construction would be, that such sales made between parties, both of whom were innocent and ignorant of any error or violation of law, must be considered as illegal and void, if it should be proved, that some fraud had been practised upon the commissioners, to procure an erroneous certificate, or that the last half of the capital, by some error or misconduct, had not in fact been all paid in. Such consequences could not have been intended; and the language does not necessarily require such a construction. The design appears to have been to require the whole capital to be paid within twelve months after receiving the

charter, and to prohibit a transfer of the shares during that time. The charter of this bank, being then a private act, took effect, and was therefore received, on April 1, 1836; and the transfer of these shares on April 1, 1837, was not made within twelve months after receiving the charter; for an act might have been legally done under the charter on April 1, 1836. Com. Dig. Temps, A.; *Castle* v. *Burditt*, 3 T. R. 623; *Priest* v. *Tarlton*, 3 N. H. R. 93; *Wheeler* v. *Bent*, 4 Pick. 167; *Windsor* v. *China*, 4 Greenl. 303.

Another ground of defence is, that the defendants held the shares as agents of the bank; and that the bank, by a written contract, agreed to indemnify and save them harmless from this note.

In no proper sense can they be considered as the agents of the bank, in making their own note payable to the bank. Whether they can be enabled to resist successfully the payment of it by such a contract, must depend upon the testimony of the witness. He states, in substance, that there was an agreement, reduced to writing, when the note was made; that he made two copies of it, one for each party; that these were signed by the directors, and not by the defendants; that both parts remained in the bank until the month of January, 1842; that he asked one of the defendants, on two different occasions, whether it was not best to have the contract signed, as he might feel safer to have it, who replied in substance, that he trusted to him, that all was safe, and to be informed, if there was apprehension of any thing; that in 1841 the defendants desired to have the contract renewed, and signed by the directors then in office; that he thereupon copied it, substituting the names of the existing directors for those of the former, and altering the date to December 1, 1841. This does not appear to have been signed by either party; and the defendants must rely upon the one bearing date on April 1, 1837, a copy of which is annexed to the deposition. Speaking of that, the witness says, "the parties considered the agreement as closed on the part of the bank; and the papers were left with me to be passed or delivered to the respective parties, whenever they

should be signed by Messrs. Burr and Holbrook;" that they
" always claimed the benefit of said agreement;" and " through-
out the whole time" they " considered me as holding the bond
for them."

Their rights must depend, not upon what they, or the
parties, considered them to be; nor upon the facts, that the
parties considered the agreement closed on the part of the
bank, and that the defendants claimed the benefit of it; but
upon the application of the principles of law to the facts
proved. The copy annexed to the deposition purports to be
an agreement between certain persons named, of the first part,
and the defendants of the second part, by which the parties of
the first part engage to indemnify and save harmless the parties
of the second part, from this note, and from all paper arising out
of it, and to pay all taxes on the shares. While the parties of
the second part, upon performance and a surrender of their
note, engage to convey the shares to the parties of the first
part, and to permit them to receive all dividends. The per-
sons named as the first party, are not stated to be directors of
the bank; and they do not profess to make the agreement in
that capacity, or to act in behalf of the bank, or for its benefit.
The shares were not to be conveyed to the bank, but to them.
The contract purports to be one made between individuals
acting for themselves alone. It does not, however, appear to
have become binding upon any person. The copy signed by
the parties of the first part, was not to be delivered, until the
counterpart of it had been signed by the other party. It is
apparent, that they could not have intended to be bound to
indemnify the defendants without being entitled to a convey-
ance of the shares. The defendants chose not to bind them-
selves by signing to make a conveyance of them. Instead of
doing it, they required a new contract, in December, 1841.
The supposed contract cannot, therefore, affect the rights of
these parties.

*Defendants to be defaulted.*


WHITMAN C. J.— It seems to me that the same principles

should govern in the decision of each of these cases. I shall therefore, proceed to the consideration of them together. By an act of the legislature the plaintiffs were, in 1836, incorporated as a banking company; and were authorized to raise a capital of fifty thousand dollars to be employed in banking operations; with all the powers and privileges, and subject to all the duties, liabilities and requirements specified in the act, " entitled an Act to regulate banks and banking," passed in 1831.

It is well known that the legislature have at all times been solicitous to guard, as far as might be practicable, against abuses in banking operations. In accomplishing such a desirable object numerous difficulties have been encountered. Banks in comparatively obscure places, with capitals of inferior magnitude, have been called for. The cupidity of individuals, in such cases, too frequently comes in conflict with the safety and rights of large portions of the people, who are continually, and in accordance with the obvious design of banking institutions, becoming creditors thereto. The act of 1831, contains numerous provisions, designed to guard against evils resulting from such causes. It is therein enacted, ($ 2) that no bank shall make loans upon a pledge of its own stock; and in $ 3, that no bank, thereafter incorporated, shall go into operation until fifty per centum of its capital shall have been paid in gold and silver; and be actually in its vaults; and that this shall be proved by the oaths of a majority of its directors; and that the same has been paid in by its stockholders, toward payment for *their respective shares,* and for no other purpose; and that it is to remain a part of its capital stock. And it is provided, further, in the same section, that the residue of the capital stock shall also be paid in gold and silver in six months next thereafter; and that no part of the capital stock of any bank shall be sold or transferred, except on execution or distress, or by executors and administrators, until the whole of the capital stock shall have been so paid in. And in $ 27, it is provided, that no stockholder shall, at any one time, hold and own more that twenty per centum of

its capital stock.  By § 33 and 34, in case a bank shall fail to pay any of its creditors within a certain time after demand therefor made, and after certain proceedings shall have taken place preparatory thereto, commissioners may be appointed, who are to take its funds into their hands, and are authorized to commence and prosecute, in the name of the corporation, or in their capacity of commissioners, any action necessary to the collection of debts due to it.  And by the act, c. 315, of 1828, § 3, it was provided, if any director or other stockholder shall aid and abet any person in borrowing and receiving from any bank any sum of money, or in otherwise becoming, for a valuable consideration, indebted to such bank with a fraudulent intent, that such sum borrowed, or debt owed, shall not be paid, and that creditors thereby shall suffer loss, and that the bank bills or bank notes, due from such bank, shall not be paid, he shall be subjected to a penalty.  These provisions are all in substance reenacted in the Revised Statutes; and show very fully what is intended to be insisted upon by the legislature.  We should now look into the cases before us, and see whether these rules have been infringed.

It appears, that this bank went into operation in September or October, of the year its charter was granted; and on the stock, in reference to which the notes of the defendants were given, there is not the least reason to believe, that any percentage, in gold or silver, was ever paid into the bank.  This stock amounted to one hundred and eighty-eight shares, being nearly nineteen fiftieth parts of the whole capital stock.  The defendants deposited their notes in the bank for the par value of these shares; and for what purpose?  It was not, as they contend, because they were, in consideration thereof, to become the real *bona fide* owners of the stock.  The bank, as they contend, had become virtually the owners of the whole of it; and ever afterwards treated it as their own.  For what purpose, and with what understanding, then, did the defendants give their notes?  Clearly to enable the bank to hold out to the public the appearance of that portion of its funds as genuine, when in fact both the defendants and the bank meant

it for nothing but a fiction. Such a transaction can be regarded in no other light than as an attempt to perpetrate a gross fraud.

It is, however, contended, that the parties were *in pari delicto;* and that, therefore, *potior est conditio defendentis.* This proposition would avail the defendants, if the nominal plaintiffs were the exclusive and real parties in interest; but this is not the case. Banking corporations are but trustees. They are artificial bodies; created with a view, in a great measure, to the public interest. The enactments before recited show, that, although they are entrusted with the funds of a large number of stockholders, and bound to manage them for their interest, they are also under obligations to hold, and so manage those funds, as to secure to their creditors, if practicable, an entire exemption from loss. This the nominal plaintiffs, the trustees in this case, have not done; and the defendants colluded with them in their misconduct. The *cestuis que trust,* the creditors of the bank, and the real parties in interest in this case, are innocent; and, if the conspiracy between the nominal plaintiffs, and the defendants, should be allowed to succeed, must be the sufferers. This action is prosecuted by those, who have been appointed by authority, in pursuance of the laws before referred to, solely to look after and secure the rights of the creditors of the nominal plaintiffs. When this shall have been accomplished the funds, if any remaining, are to be restored to the corporation. We cannot, under such circumstances, shut our eyes, and refuse to see that creditors may be defrauded, unless the defendants are holden responsible. The creditors therefore are not to be affected by the maxim referred to. The defendants cannot succeed, but by taking advantage of their own wrong against innocent parties, which the law will not permit. The pretended agreement, therefore, between the nominal plaintiffs and the defendants, as to the cancelling of the notes without actual payment, if it ever existed, must, so far as the parties in interest here are concerned, be regarded as null and void.

It is further insisted in the defence, that there was no consideration for the promises of the defendants. And it may be admitted, that they have derived no pecuniary benefit from the stock, in reference to which their notes were given. But a consideration may consist of harm to the promisee in interest when no benefit may have accrued to the promisor. The defendants promised the nominal plaintiffs, to pay them large sums, with a design, as we must believe, to aid them in practising a deception upon all, who might be induced to give credit to the ability and solvency of the institution ; and especially to the plaintiffs in interest in these suits. The notes, according to the showing of the defendants themselves, were given and continued among the ostensible assets of the nominal plaintiffs, for nearly or quite the whole time, the bank was in operation, a period of nearly six years. During all that time the bank was enabled to exhibit these notes to the bank commissioners, annually appointed to inspect the doings of the banks ; and to make return semi-annually of their affairs to the Governor and Council, comprising the amount due on these notes among the debts due *bona fide* to the bank ; thus concealing from the public, and the plaintiffs in interest, that these notes were not regarded as constituting a part of their available assets, if such were the fact ; and the defendants cannot be regarded otherwise, than as having aided the nominal plaintiffs, wittingly and willingly, in holding out to the plaintiffs in interest, these notes as a substantial portion of the resources of the bank, to enable it to redeem its circulating paper. The defendants, therefore, it seems to me, cannot be permitted, now to set up, in defence of this action, that their notes were not given for a valuable consideration.

But a distinction is supposed to exist between the two first named cases, and the last ; and that defaults must be entered in the two former, in which I concur, and that a nonsuit must be entered in the latter, in which, for the foregoing reasons, I do not concur. It is true that a fact exists in the latter, which does not exist in the former. This fact, however, which is, that the stock for which the note of the defendants in the

latter was given, was not actually transferred to them by name, but stood in that of the bank. To me, so far as it regarded the bank, and the defendants, in relation to their respective rights this was but a mere formality. True it is, that, as it might have affected the rights of the creditors of the defendants, it might have been otherwise. But no such question arises; and aside therefrom, and, as between the bank and the defendants, there was essentially no distinction intended or actually existing. The stock in the one case stood in the names of the defendants on the books of the bank, and, in the other, in the name of the bank. Nevertheless, the parties concerned, regarded their situation, in reference thereto, as precisely alike. The bank, in neither case, considered the defendants as the owners of the stock; but treated it upon all occasions as their own; and the defendants, without the slightest pretence of claim on their part, have ever acquiesced in their doing so; and, moreover, the testimony of the cashier of the bank fully proves such to have been in accordance with the explicit understanding and agreement of the parties. There was, then, the same consideration for the promise in the one case as in the others. No position is more frequently laid down, nor more uniformly adhered to, than that contracts between parties, when the rights of third persons are not in question, are to be interpreted as they themselves understood them, when no stern rule of law interferes to prevent it, and none such occurs in this case. No one can fail to perceive, that the imputation of a fraudulent purpose may be made with equal propriety in reference to either of the defendants, without the slightest discrimination. To my apprehension, therefore, it is clear, that they stand upon an equal footing; and that it will be a palpable perversion of justice to suffer any of them to escape from the liability to the plaintiffs in interest, which, by the terms of their contract, and by their conduct for a series of years they have deliberately incurred.